Kenneth MORAN, Petitioner,

v.

Paul J. MORRIS, Warden, Respondent.

No. CV 78–9753–RMT(S).

United States District Court,
C. D. California,
Civil Division.

July 25, 1979.

As Amended Sept. 5, 1979.

The Court has reviewed the petition, the return, the records submitted therewith, the traverse, the other points and authorities filed by the parties, and the attached Report and Recommendation, and concurs with and adopts the findings and conclusions of the United States Magistrate.

IT IS ADJUDGED as follows:

1. That petitioner was convicted in violation of the Constitution of the United States.

2. That petitioner is entitled to issuance of a writ of habeas corpus from this Court.

IT IS ORDERED that a writ of habeas corpus issue discharging petitioner from custody unless the respondent and the State of California shall, within sixty days from the date the Court's judgment becomes final, permit petitioner to file a motion, pursuant to Penal Code § 1538.5, in the Los Angeles Superior Court to suppress the physical evidence referred to in the Magistrate's Report and Recommendation.

IT IS FURTHER ORDERED that the Clerk of the Court shall service copies of this Order, the Judgment, and the Report and Recommendation of the United States Magistrate, by United States mail, on the petitioner, petitioner's counsel, the Attorney General of the State of California and the Presiding Judge of the Superior Court of the State of California for the County of Los Angeles.

Leslie H. Abramson, Beverly Hills, Cal., for petitioner.

George Deukmejian, Atty. Gen., Robert H. Philibosian, Chief Asst. Atty. Gen., Crim. Div., S. Clark Moore, Asst. Atty. Gen., Robert F. Katz, Dixie Moe, Deputy Attys. Gen., Los Angeles, Cal., for respondent.

## ORDER CONDITIONALLY GRANTING PETITION FOR WRIT OF HABEAS CORPUS

TAKASUGI, District Judge.

Pursuant to 28 U.S.C. § 636(b)(3), attached is the Report and Recommendation of the United States Magistrate who has reviewed the petition filed herein for issuance of a writ of habeas corpus.

## REPORT AND RECOMMENDATION ON PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

HARVEY A. SCHNEIDER, United States Magistrate.

This Report and Recommendation is submitted to the Honorable Robert M. Takasugi, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(3) and General Order No. 194 of the United States District Court for the Central District of California.

### Statement of Facts and Proceedings

On February 27, 1978 petitioner filed his Petition for Writ of Habeas Corpus. The petition alleges that on February 6, 1975 petitioner was sentenced to state prison for the term prescribed by law following his convictions of violating California Penal Code §§ 209 (kidnapping for the purpose of robbery—two counts); 211 (robbery—two counts); 459 (burglary—three counts); and 182 subd. 1 (conspiracy to commit robbery, kidnapping and burglary).[1] Petitioner's conviction was sustained in the Los Angeles Superior Court. The petition further alleges that the judgment of conviction was affirmed by the California Court of Appeal (on December 3, 1975) and that a subsequently filed petition for hearing was denied by the California Supreme Court.

The petition also alleges that petitioner previously filed petitions for writ of habeas corpus in the Sacramento County Superior Court, the California Court of Appeal and the California Supreme Court. Petitioner asserts that in each of these petitions there were raised the same issues as are presented in the present petition and that each of such petitions was denied.

On April 21, 1978 respondent filed his Return to Petition for Writ of Habeas Corpus. On June 14, 1978 petitioner filed his traverse to the return.

On June 22, 1978 Leslie Abramson, Esq. was appointed to represent petitioner and the matter was set down for a status conference on June 26, 1978. On the latter date the cause was set down for an eviden-

tiary hearing to be held on September 12, 1978. The evidentiary hearing was subsequently continued to September 26, 1978 and again to October 24, 1978 and January 26, 1979.

On January 23, 1979 pursuant to the Magistrate's order, petitioner, through counsel, filed his Specifications of Incompetence of Trial Counsel Claimed by Petitioner Moran and Points and Authorities.

On January 26, 1979 the cause came on for an evidentiary hearing. The hearing was required to be continued to February 7, 1979 due to the fact petitioner had inadvertently not been ordered out for the hearing. On February 7, 1979 the hearing was continued to February 9. On the latter date the evidentiary hearing commenced and, at the conclusion of the day's proceedings, was continued to February 13, 1979. The hearing resumed on the latter date and was then continued to February 14, on which date the hearing was completed. The parties were then given time within which to file additional points and authorities with the Court. On March 15 and March 20, 1979 respondent and petitioner, respectively, filed supplemental points and authorities.

Following the submission of the last referred to points and authorities, counsel for the parties and the Magistrate embarked upon the somewhat tedious task of crystalizing the issues which petitioner desired to present to the Court and determining whether petitioner had exhausted state remedies with respect to each of those is-

---

1. The information filed against petitioner charged him and two co-defendants (Papageorge and Bartolotta) with the following offenses: Count I (burglary—petitioner, Papageorge and Bartolotta); Count II (kidnapping for the purpose of robbery—petitioner, Papageorge and Bartolotta); Count III (burglary—petitioner, Papageorge and Bartolotta); Count IV (robbery—petitioner, Papageorge and Bartolotta); Count V (kidnapping for the purpose of robbery—petitioner and Papageorge); Count VI (burglary—petitioner and Papageorge); Count VII (robbery—petitioner and Papageorge); Count VIII (robbery—petitioner and Papageorge); Count IX (burglary—petitioner and Papageorge); and Count X (conspiracy—petitioner, Papageorge and Bartolotta). The victim in

Counts I through IV, inclusive, of the information was one Heckle Lynn and the victim in Counts V through VIII, inclusive, was one Donovan Hargens. Counts I through IV and Counts V through VII will hereinafter be referred to as the "Lynn offenses" and the "Hargens offenses," respectively. It is unnecessary to delineate the charges contained in Counts VIII and IX of the information since the jury was unable to reach a verdict with respect to these charges and the trial court ultimately dismissed them in the interest of justice. Count X charged petitioner and his co-defendants with conspiring to commit the substantive offenses alleged in Counts I through VII of the information.

sues. Counsel and the Magistrate also spent considerable time discussing, during several status conferences, the impact, if any, on this case of such recent decisions as *Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976); *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); and *Cooper v. Fitzharris,* 586 F.2d 1325 (9th Cir. 1978). These discussions were augmented by additional points and authorities filed by counsel.

### Petitioner's Contentions

As the result of the many proceedings held in this case and the documents submitted by the parties, petitioner abandoned a number of issues which he had at one time or another presented to this Court for determination in connection with the instant case. As a result of the abandonment by petitioner of certain issues it now appears petitioner is attacking his multiple convictions on the following grounds and no others:

1. That petitioner's trial counsel did not afford petitioner competent representation prior to the commencement of trial in that:

a. Counsel failed to research the applicable law on search and seizure relative to petitioner's standing to object to the introduction of property seized from the Cusick premises.

b. Counsel failed to notice or conduct a Penal Code § 1538.5 motion prior to trial aimed at the suppression of the briefcases and contents seized from the Cusick premises.

c. Although urged by petitioner to do so, trial counsel failed to subpoena petitioner's jail records from the Costa Mesa City Jail and the Orange County Jail in order to determine if petitioner was incarcerated at the time that a crucial meeting allegedly occurred between petitioner and the chief witness against him.

d. Trial counsel failed to obtain the police reports concerning a complaint by the witness Timmons of a burglary occurring at his premises in 1974, which burglary may have been the basis for the witness' revenge motive in attributing a damaging statement to petitioner.

2. That petitioner's trial counsel did not afford petitioner competent representation during trial in that when, during the examination of the accomplice and chief witness Hayward, the prosecutor indicated his intent to introduce evidence seized from the Cusick premises, trial counsel failed to move to suppress the evidence pursuant to Penal Code § 1538.5 based on the erroneous belief that petitioner lacked standing to challenge that search.

3. That evidence was introduced against petitioner at his trial which was obtained in violation of the Fourth Amendment to the United States Constitution.

4. That the state trial court erroneously denied petitioner's motion to dismiss the information in that petitioner was held to answer on insufficient evidence, i. e., the uncorroborated testimony of an accomplice.

5. That the trial court erred in not instructing the jury that petitioner's oral admission was required to be viewed with caution.

### Discussion

*The Issues Relating to the Trial Court's Alleged Errors in Failing to Dismiss the Information and in Erroneously Instructing the Jury*

As indicated above, petitioner has presented a number of issues to this Court for determination. Two of these issues may be disposed of summarily.

█ Petitioner's contention that the trial court erroneously denied his motion to dismiss the information in that he was held to answer on insufficient evidence, i. e., the uncorroborated testimony of an accomplice, is clearly without merit. It is well established in this Circuit that a *conviction* may be based on the uncorroborated testimony of an accomplice, provided that testimony is

not incredible or unsubstantial on its face. See, e. g., *U. S. v. Sigal*, 572 F.2d 1320 (9th Cir. 1978). Since no federal constitutional question is presented when a conviction rests upon the uncorroborated testimony of an accomplice, *a fortiori* no such question is presented when a state criminal defendant is held to answer in state court based upon such testimony.

 Petitioner's claim that the trial court erred in failing to instruct the jury that petitioner's oral admission was required to be viewed with caution is equally without merit. It must first be noted that no such instruction was requested by petitioner. Beyond this, it is well established that the failure of a state judge to give a particular instruction does not raise a federal constitutional question unless the error rendered the trial so fundamentally unfair as to have denied the defendant due process of law. *Shepherd v. Nelson*, 432 F.2d 1045 (9th Cir. 1970). A review of the record in this case fails to reveal petitioner was denied due process of law by reason of the fact the trial court failed to give the instruction in question *sua sponte*. Moreover, the fact the United States Supreme Court has recently held that even so important an instruction as one relating to the presumption of innocence is not required to be given in every criminal case (*Kentucky v. Whorton*, —— U.S. ——, 99 S.Ct. 2088, 60 L.Ed.2d 640 (1979)) [2] tends to corroborate the Magistrate's belief that no due process violation occurred when the trial court failed to give the instruction currently under discussion.

### Petitioner's Fourth Amendment Claim

Petitioner claims that evidence was introduced against him at his trial which was obtained in violation of the Fourth and Fourteenth Amendments. Petitioner's claim is specifically directed at two briefcases, and the contents thereof, seized from premises occupied by the Cusick family. The evidence in question was marked as People's Exhibits 6, 6A–F, 7, and 7A–D at petitioner's trial. Petitioner's claim does

not require extended discussion in light of the decision in *Stone v. Powell, supra*. In *Stone* the court stated:

"In sum, we conclude that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial. . . ." (428 U.S. at p. 494, 96 S.Ct. at p. 3052.)

 In light of *Stone* it appears that if a state has established a procedure which can be utilized by a criminal defendant to suppress evidence seized pursuant to an alleged illegal search and seizure, the state has fulfilled the requirement that it provide the "opportunity" to litigate Fourth Amendment claims, and such claims may not be addressed by a federal habeas corpus court. *Tisnado v. United States*, 547 F.2d 452 (9th Cir. 1976); *Sallie v. State of North Carolina*, 587 F.2d 636 (4th Cir. 1978). California has established a procedure for litigating Fourth Amendment claims. See Penal Code § 1538.5. Accordingly, it would appear this Court is barred from addressing petitioner's Fourth Amendment claims directly in this proceeding even though, as will be made clear below, petitioner's Fourth Amendment claims were not presented to the state trial court due to the conduct of petitioner's trial counsel.

### Petitioner's Sixth Amendment Claims

As indicated above, petitioner's remaining contentions relate to claims that his trial counsel, both prior to and during trial, did not afford to him the competent representation which is guaranteed by the Sixth Amendment to the United States Constitution. It is to these claims which the Magistrate now turns.

Before addressing petitioner's incompetence of counsel claims on the merits, it is important to note that all but two of these claims involve the contention that counsel's alleged pretrial and trial incompetence re-

---

**2.** Cf. *Taylor v. Kentucky*, 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978).

sulted in evidence being introduced at petitioner's trial which was obtained in violation of the Fourth Amendment. In light of this fact respondent, relying on *LiPuma v. Commissioner, Department of Corrections, State of New York*, 560 F.2d 84 (2d Cir. 1977, *cert. denied* 434 U.S. 861, 98 S.Ct. 189, 54 L.Ed.2d 135 (1977)), contends that *Stone v. Powell, supra*, precludes a federal habeas corpus court from granting relief to a state prisoner whose claim of incompetence of counsel is based on counsel's failure to properly advance a Fourth Amendment claim.[3]

Petitioner, on the other hand, relying on *Sallie v. State of North Carolina, supra*, contends that where the petitioner's claim is that he was denied competent representation, the federal habeas corpus court may properly grant relief to the petitioner even though the underlying basis of the Sixth Amendment claim is that counsel's incompetence precluded the petitioner from receiving state court adjudication of a Fourth Amendment claim.[4] In a word, the Magistrate believes *Sallie* is correct and that *LiPuma* is incorrect.

The rationale of the decision in *Stone v. Powell, supra*, is quite clear. Thus, it is patent the court concluded that the deterrent effect of the exclusionary rule is not served when a federal habeas corpus court grants relief to a state prisoner based on a Fourth Amendment claim, assuming the petitioner had a full and fair opportunity to litigate his Fourth Amendment claim in the

state courts. The court reasoned that "the additional contribution, if any, of the consideration of search-and-seizure claims of state prisoners on collateral review is small in relation to the costs . . . There is no reason to believe, however, that the overall educative effect of the exclusionary rule would be appreciably diminished if search-and-seizure claims could not be raised in federal habeas corpus review of state convictions. . . ." (428 U.S. at p. 493, 96 S.Ct. at p. 3052).

The claim that trial counsel was incompetent, even though the claim of incompetence is based on counsel's failure to properly pursue and/or present a Fourth Amendment claim, implicates an entirely different interest. Thus, if federal habeas corpus relief is granted to a petitioner who claims he was denied competent representation because his counsel failed to advance a Fourth Amendment claim, the purpose of that relief is not all directed at punishing the police officers who engaged in the illegal search and seizure. Rather, relief is granted because the petitioner was denied the right to the fair trial that is guaranteed to all persons accused of crime in that he was represented by counsel who failed to afford competent representation and who thereby deprived the petitioner of a valuable constitutional right (the right to be free from an illegal search and seizure).

Having concluded that this Court is not barred by *Stone v. Powell, supra*, from con-

---

3. The *LiPuma* court's discussion of this issue is contained in footnote 6 to its opinion wherein the court stated: "The fact that petitioner's claim is ostensibly grounded on the Sixth, rather than the Fourth, Amendment does not negate *Stone*'s applicability, because at the heart of this case lies an alleged Fourth Amendment violation. That is, should petitioner have succeeded in showing in the state trial court, that the police entry into Room 613 was an unconstitutional search and seizure, the remedy decreed for such a violation would have been the exclusion of the allegedly 'tainted' testimony of the police officers regarding the circumstances of LiPuma's arrest. The same remedy of exclusion is now sought by way of a collateral habeas corpus proceeding, where a Sixth Amendment claim has been added for good measure. The majority wrote in *Stone* that '[o]ur decision today is not concerned with the scope of the

habeas statute as authority for litigating constitutional claims. We do reaffirm that the exclusionary rule is a judicially created remedy rather than a personal constitutional right . . . and we emphasize the minimal utility of the rule when sought to be applied to Fourth Amendment claims in a habeas corpus proceeding.' . . .'" (560 F.2d at pp. 93–94, fn. 6).

4. In *Sallie* the court stated as follows: "As we have said, *Stone v. Powell* precludes further fourth amendment collateral attacks. But we do not read it to say that issuance of a writ of habeas corpus on sixth amendment grounds is barred if a defense attorney fails to object to the admission of evidence obtained in clear violation of the fourth amendment. . . ." (587 F.2d at p. 640).

sidering petitioner's claims that he was denied the effective assistance of counsel (even though the allegedly ineffective assistance involves counsel's failure to move to suppress evidence allegedly obtained in violation of the Fourth Amendment), the Magistrate now turns to a discussion of these claims on the merits.

### The Test for Determining Competency of Counsel

■ Although at one time there was uncertainty in this Circuit concerning the test to be applied in determining whether a criminal defendant was rendered the assistance of counsel mandated by the Sixth Amendment, that uncertainty was resolved in *Cooper v. Fitzharris, supra.* In *Cooper* the court specifically stated:

> "We hold that the Sixth Amendment requires that persons accused of crime be afforded reasonably competent and effective representation. We also hold that where, as here, the claim of ineffective assistance is founded upon specific acts and omissions of defense counsel at trial, the accused must establish that counsel's errors prejudiced the defense. . . ." (586 F.2d at p. 1327)[5]

In light of *Cooper* the appropriate inquiry is whether petitioner's trial counsel afforded reasonably competent and effective representation pre-trial and during trial and, if not, whether counsel's failure to render such assistance prejudiced the defense.

5. The fact the court in *Cooper* held that the incompetence of counsel must have prejudiced the defense in order for the petitioner to be entitled to relief in a federal habeas corpus proceeding buttresses the Magistrate's earlier conclusion that *Stone v. Powell* does not preclude this Court from addressing a Sixth Amendment claim grounded on counsel's failure to present a Fourth Amendment claim in the state courts. Thus, it must be noted that one of the claims of incompetence of counsel presented in *Cooper* was counsel's failure to object to the admission of the fruits of a warrantless search of Cooper's person and home. If the *Cooper* court had believed *Stone* precluded consideration of Cooper's claim that his counsel was incompetent in not presenting the Fourth Amendment claim, the court could have easily disposed of the Sixth Amendment claim

### The Evidence Relating to Petitioner's Claim that Counsel Acted Incompetently Prior to Trial and During Trial by Not Asserting a Fourth Amendment Claim on Petitioner's Behalf

In order to analyze petitioner's claim that his counsel incompetently failed to present a Fourth Amendment claim on his behalf before and during trial, it is necessary to understand the sequence of events that occurred in the trial court. This sequence is disclosed by the trial court record, as well as the evidence adduced at the evidentiary hearing held in this Court.

Ronald Hayward was the first, and undoubtedly most critical, witness called by the prosecution at petitioner's trial. In essence Hayward, who had been given immunity with respect to the offenses of which petitioner was charged and who had been promised aid by the prosecution with respect to another offense of which he (Hayward) had been convicted, testified that he committed the Lynn and Hargens offenses and that petitioner was his crime partner with respect to those offenses.[6] While Hayward was on the witness stand, and out of the presence of the jury, the prosecutor indicated that he was "going to have Mr. Hayward identify physical evidence that I think somebody's going to object to." (RT 256) Thereafter, an extended colloquy took place between the court, the prosecutor, and counsel for petitioner and his co-defendants. This colloquy, which is contained at pages 257–268, inclusive, of the Report-

on that ground. This the court did not do. Rather, the court proceeded to apply its two-pronged test of whether counsel rendered reasonably competent and effective representation and if not, whether counsel's failure so to do prejudiced the defense. The court's course of conduct in *Cooper* clearly demonstrates it did not believe *Stone* precluded consideration of an incompetence of counsel claim based on counsel's failure to properly present a Fourth Amendment claim in the state courts.

6. The trial court instructed the jury that "If the crimes charged in this case were committed by anyone, the witness RONALD HAYWARD was an accomplice as a matter of law and his testimony is subject to the rule requiring corroboration." (CT 75)

er's Transcript, is attached hereto as Appendix A (with pertinent parts thereof underscored).

Following some additional colloquy, Hayward was permitted to identify two briefcases (People's Exhibits 6 and 7) as being ones which Hayward believed petitioner had in his possession during the commission of the Lynn and Hargens offenses, among others. (RT 281–282)[7] Hayward then identified a pair of handcuffs contained in People's Exhibit 6 as one which he (Hayward) had previously seen in petitioner's car. (RT 282) After Hayward identified a windshield wiper arm that was also contained in People's Exhibit 6, an additional colloquy took place between the court, the prosecutor and defense counsel outside of the jury's presence. This colloquy, which is contained on pages 282–285 of the Reporter's Transcript, is attached to this Report as Appendix B. Following this colloquy Hayward was permitted to testify that the windshield wiper arm was used for breaking into cars. (RT 285)[8] Hayward then proceeded to identify additional items contained within the two briefcases as ones which he and petitioner used during the commission of the offenses for which petitioner was on trial. (RT 286–288)

At the conclusion of the People's case-in-chief the court inquired if there was any objection to the introduction of any of the exhibits (RT 681), following which the following colloquy took place between petitioner's counsel and the court:

"MR. DEMBY: [petitioner's counsel]: . . . As to the other items found at the house, in the suitcases, there is also no showing that they were obtained in a legal manner. For the same reason, they should not be allowed into evidence.

"I would submit it on that.

"THE COURT: Well, there is no requirement that the prosecution provide such a foundation unless it is challenged in some way, Mr. Demby. That would apply to every piece of evidence that is offered in a trial. You could make that objection, that the People haven't shown that they obtained it legally.

"The objection is overruled." (RT 682–683)

Thereupon, People's Exhibits 6 and 7, and their contents, were admitted into evidence. (RT 684)

After petitioner was convicted, proceedings were had in connection with a motion for new trial filed on his behalf. During this proceeding petitioner's counsel, the prosecutor and the court made significant statements concerning defense counsel's failure to move to suppress the items contained in Exhibits 6 and 7. These statements are set forth on pages 944–955, inclusive, of the Reporter's Transcript and are attached to this Report as Appendix C.

At the evidentiary hearing held in this Court Michael Demby, the Deputy Public Defender who represented petitioner in the trial court, testified that at the time of his representation of petitioner he had been a public defender for five years and had been trying felony cases for two years. During the time he represented petitioner Mr. Demby could recall no conversation he had had with petitioner concerning the briefcases found on the Cusick property and his file contained no reference to any such conversations. In fact, Mr. Demby testified that it was his belief he first heard about the briefcases after petitioner's trial had begun and during the testimony of the first witness (Ronald Hayward). Mr. Demby made no formal discovery motion on behalf of petitioner while representing him in the Los

---

7. People's Exhibits 6 and 7 have been aptly described as "burglary kits." Thus, People's Exhibit 6 contained handcuffs (Exhibit 6–A); a handcuff box (Exhibit 6–B); four rolls of adhesive tape (Exhibit 6–C); a box of .380 ammunition (Exhibit 6–D); a pair of gloves (Exhibit 6–E); and a tubular bandage (Exhibit 6–F). People's Exhibit 7 contained license plates (Exhibit 7–A); license plate brackets (Exhibit 7–

B); ether (Exhibit 7–C); and handcuff keys (Exhibit 7–D). As will be discussed below, Hayward testified that almost all of the items contained within Exhibits 6 and 7 were the kinds of items utilized by him and petitioner in carrying out the Lynn and Hargens offenses.

8. Ultimately the windshield wiper arm was refused admission into evidence.

Angeles Superior Court. Mr. Demby testified that he never talked to Rita Cusick prior to trial; he did talk to Dixie Moran (petitioner's wife) but was not certain whether it was before or after trial.

Mr. Demby testified that prior to trial the deputy district attorney, Mr. Watson, informed him as to what evidence was and was not going to be introduced by the prosecution. Mr. Demby believed the prosecution was going to introduce the same evidence that had been introduced by it at the preliminary hearing held in petitioner's case. No items taken from the briefcases (People's Exhibits 6 and 7) had been introduced at the preliminary hearing. Mr. Demby stated that although he had obtained some discovery material from the prosecutor, he obtained the most discovery material from counsel for one of the co-defendants.

Mr. Demby testified that prior to trial he was not in possession of any police reports relating to the seizure of the briefcases from the Cusick property. He further testified he was aware that Hayward's testimony, being that of an accomplice, was required to be corroborated. In fact, he was concerned about the matter of corroboration prior to trial. Mr. Demby also testified that he relied on the representations made by the prosecutor as to the evidence that would be introduced and that he believed he had been "sandbagged" by the prosecutor when the latter sought and was granted permission to enter into evidence the briefcases and their contents. Mr. Demby reiterated his position that the first time he had ever heard of the items of evidence contained in the two briefcases was when the prosecutor mentioned them during the trial when Hayward was on the witness stand.

Mr. Demby testified he was aware he could have made a motion to suppress the contents of the two briefcases during trial on the ground of newly discovered evidence. He repeated his belief that he first saw the

police reports relating to the seizure of the briefcases during trial. After receiving these reports Demby realized search and seizure issues were presented. He did not make a motion to suppress at this time, however, because he didn't think clearly and wasn't aware that, contrary to his stated position at trial, a defendant who seeks to suppress evidence obtained as the result of an illegal search and seizure is not required to have any particular standing under California law. Mr. Demby conceded that he did not possess before trial all of the information he should have had with respect to the items seized from the Cusicks, and that had he possessed such material he would have done things differently. He could not remember if he had made any effort to look at any physical evidence prior to trial. Mr. Demby admitted he was surprised when the prosecutor indicated he was going to use the contents of the two briefcases. He then realized he did not have all of the information he thought he had.

Mr. Demby could not remember if he though about asking for a continuance when he was first confronted with the contents of the two briefcases; he did, however, know he wanted to make a motion to suppress. Although Demby objected to the introduction into evidence of the contents of the briefcases, he did not make a formal motion to suppress as the court had earlier invited him to do. When he made the objection he knew it came too late since no record had been developed concerning the manner in which the briefcases had been seized. Mr. Demby admitted that no tactical advantage enured to the defense by allowing the contents of the briefcases into evidence. He also conceded he had made no conscious effort to allow the contents of the briefcases into evidence.

Mr. Demby did not believe either petitioner or petitioner's wife had mentioned the briefcases to him prior to trial.[9] He knew the contents of the briefcases would be harmful to petitioner's case. After read-

9. This testimony was contradicted by the testimony of petitioner's wife, Dixie, who stated she did tell Demby prior to trial about the seizure of the briefcases. Petitioner also testified that he discussed the briefcases and their contents with Demby prior to trial.

ing the police reports concerning the seizure of the briefcases, Demby believed the search and seizure was unlawful. He repeated his belief that it was his misapprehension concerning the California law relating to standing to raise search and seizure issues which caused him not to make a motion to suppress during trial, i. e., he believed petitioner had no standing to make a motion to suppress because the briefcases were not discovered on petitioner's property.

Mr. Demby admitted he was confused when confronted with the briefcases seized from the Cusicks. He also thought he had been deceived by the prosecutor. Demby had engaged in no research after being confronted by the contents of the briefcases and before stating he did not believe petitioner had standing to challenge the legality of the search pursuant to which those contents were seized.

### Petitioner's Claim of Pre-Trial Incompetence

Petitioner claims he was denied the assistance of counsel guaranteed by the Sixth Amendment in that counsel failed to research the applicable law on search and seizure relative to petitioner's standing to object to the introduction of the property seized from the Cusick premises and failed to notice and conduct a Penal Code § 1538.5 motion prior to trial aimed at the suppression of the briefcases and their contents.[10] The evidence in the record relating to these claims, which has been extensively summa-

rized above, supports petitioner's claim that counsel failed to afford to petitioner reasonably competent and effective representation by failing to move to suppress the contents of the briefcases seized from the Cusick property prior to trial. In reaching this conclusion the Magistrate acknowledges the fact that it may be true that, by inadvertence, the police reports relating to the seizure of the briefcases were not turned over to counsel and that, as a result, counsel was unaware of the contents of the briefcases until the subject was brought up during the testimony of the first trial witness. The Magistrate believes, however, that the evidence of record reveals it was counsel's own pre-trial lack of diligence which placed him in the position of being ignorant of the contents of the briefcases until after petitioner's trial had commenced.

■ Upon first being advised that the prosecutor intended to introduce into evidence the contents of the briefcases, Mr. Demby stated that he "was originally under the impression that none of this stuff was found in the possession of Mr. Moran . . . but were found by other people when Mr. Moran was not present. . . ." (RT 260) This statement would tend to indicate, contrary to Mr. Demby's evidentiary hearing testimony, that he was aware of the seizure of the items in question prior to trial. Mr. Demby then stated "I may have misread some, but Mr. Watson has just stated some stuff was found in some lot, and I take it that lot has no connection with Mr. Moran." (Tr. 260) This statement also suggests Mr. Demby had read some materi-

10. It should be noted respondent contends that petitioner has failed to exhaust state remedies with respect to the claim that counsel acted incompetently by not filing a motion to suppress prior to trial. Respondent argues that since counsel's failure to make the motion appears of record, the issue was required to be presented on petitioner's direct appeal to the California Court of Appeal and that the failure to present the issue on appeal constituted a deliberate bypass of a state remedy, "i. e., direct appeal, and therefore the federal court need not consider the issue. (*Harris v. Superior Court of California* (9th Cir. 1974) 500 F.2d 1124, 1129, fn. 7)." (Respondent's Answer to Response to Order of May 4, 1979, Filed June 19, 1979, at p. 3) Respondent's contention is

without merit in that it is abundantly clear an insufficient evidentiary record was developed in the trial court so as to have allowed the Court of Appeal to determine whether counsel had acted *incompetently* by making a pre-trial motion to suppress. Stated another way, since the question of whether the briefcases were seized from the Cusick property in a lawful manner was not developed in the trial court, there is no way the Court of Appeal could have determined whether counsel's inaction resulted in depriving the defense of a potentially meritorious Fourth Amendment claim. It is clear, therefore, that petitioner is not barred from presenting the claim under discussion to this Court because he did not present it to the California Court of Appeal on direct appeal.

al concerning the items in the briefcases prior to trial. In any event, assuming *arguendo* Mr. Demby was in fact unaware of the contents of the briefcases prior to trial, the fact is he was not so aware due to his own inaction. Thus, the record reflects that Mr. Demby did not make a formal discovery motion on behalf of petitioner and was content to obtain most of the discovery he received from counsel for a co-defendant. Mr. Demby also admitted he was under a misapprehension concerning whether any property had been seized from any of the defendants. This misapprehension was not surprising in light of the fact Demby never accepted the prosecutor's written invitation (by letter dated October 17, 1974 —Exhibit A to Return) to examine all of the documentary evidence in the hands of the prosecution. Had he promptly accepted this invitation, the police reports relating to the seizure of the property from the Cusicks would have become evident. (RT 950–952) Counsel's misapprehension was all the less surprising in light of the fact he apparently failed to accept the prosecutor's oral invitation to examine the physical evidence in the case, *including the briefcases and their contents.* (RT 953) It also appears Mr. Demby may have chosen not to examine the physical evidence in the hands of the prosecutor because he assumed the prosecutor was going to introduce at trial only the evidence that was introduced at the preliminary hearing. The making of such an assumption does not fall within the range of conduct that one would expect from an attorney rendering reasonably effective assistance. *People v. Shells,* 4 Cal.3d 626, 94 Cal.Rptr. 275, 483 P.2d 1227 (1971). Indeed, Mr. Demby's admission on several occasions that he had been "sandbagged" by the prosecution further supports the conclusion Demby did not afford petitioner reasonably competent and effective representation prior to trial by failing to move to suppress the contents of the briefcases—evidence of which he should have been aware had he engaged in proper investigation and preparation.

Moreover, had counsel taken the steps necessary to become aware of the contents of the briefcases prior to trial, he would have been in a position to engage in pre-trial research which, one would hope, would have disclosed the California law that petitioner in fact had standing to move to suppress the briefcases and their contents on the ground they were obtained as the result of an illegal search and seizure. (See discussion, *infra.*) In sum, the Magistrate has concluded petitioner was denied the reasonably competent and effective representation to which he was entitled when his trial counsel, due to inadequate preparation and investigation, failed to make a motion pursuant to California Penal Code § 1538.5 to suppress the contents of the two briefcases in question. *Brubaker v. Dickson,* 310 F.2d 30 (9th Cir. 1962).

By concluding petitioner's counsel failed to render reasonably effective assistance, the Magistrate has necessarily found that counsel failed to act "within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970). This finding is not enough under *Cooper* to justify the issuance of a writ of habeas corpus. Thus, before the writ may issue it must also be determined, pursuant to the mandate of *Cooper,* that counsel's ineffective representation prejudiced the defense.

Although the court in *Cooper* did not define what it meant by the term "prejudice," it is clear the term "does not mean that relief is available only if the defendant would have been acquitted but for counsel's blunders." (*Cooper v. Fitzharris, supra,* at p. 1333) Moreover, it should be noted that in discussing one alleged ground of incompetence of counsel raised in *Cooper,* the court stated that "Even if counsel was negligent in this respect, the error was not prejudicial. . . ." (586 F.2d at p. 1334) This statement would seem to indicate that the evidence which must be adduced in order to demonstrate "prejudice" under the *Cooper* test is no greater, and perhaps less,[11]

---

**11.** In her dissenting opinion in *Cooper,* Judge Hufstedler stated that "The majority also sug-

gests that the weight of the burden of proof may be something less than that employed by

than is required under the traditional harmless error test enunciated in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[12] The Magistrate believes, *Chapman*'s harmless error test should be applied in analyzing the concept of prejudice delineated in *Cooper*.

 The principle of harmless error (i. e., prejudice) cannot be applied in a vacuum. In other words, the Magistrate believes that before it can be determined in the present case that counsel's ineffective representation prejudiced the defense, two factors must coalesce, namely, (1) that counsel's ineffective representation resulted in a potentially meritorious motion to suppress not being made and (2) that if such motion had been made and granted there is a reasonable possibility petitioner would not have been convicted. (*Chapman v. California, supra*, at p. 23, 87 S.Ct. 824)

### The Potentially Meritorious Defense Issue

Based on the evidence adduced at the evidentiary hearing, it appears that on August 28, 1974 Stanley Cusick, age 19, and a friend were shooting firecrackers in the back yard of the Cusick home located at 11907 Molette in the City of Norwalk. As a result of the noise generated by these firecrackers, a "shots fired" call was broadcast over the police radio network. Shortly thereafter a number of Los Angeles County Deputy Sheriffs responded to the scene.

Although there is a factual dispute as to whether the law enforcement officers entered the Cusick back yard with or without consent and whether firecracker debris lay on the ground in the back yard, there is no real dispute with respect to the critical events which transpired after the officers entered the back yard. Thus, it is clear that when the officers arrived in the Cusick back yard, Stanley Cusick and his friend were detained by several of the officers and Deputy Scott in particular. Following this detention, Deputy Sheriff Vega, who had also responded to the scene, observed a pellet gun lying on a table in the back yard. Deputy Vega then smelled the odor of burnt gunpowder in the area of the table on which the pellet gun was lying. He then followed this odor to a shed located at the rear of the Cusick back yard. The odor of gunpowder was strongest by this shed. Vega then looked into the shed, the door of which was open,[13] and then entered it. In the shed he observed a pellet rifle which was broken. He then observed the briefcases which are involved in the present case. These briefcases, contrary to the other items in the shed, were free of dust. Deputy Vega then opened the latched briefcases (one being pried open by Deputy Foote) and looked inside. At the time he opened the briefcases Deputy Vega was purportedly looking for an automatic or semi-automatic weapon. The shed in which the briefcases were found was located 20 to 25 feet away from where Deputy Foote was detaining Stanley Cusick and his friend. Deputy Vega had permission from no one to enter the shed, seize the briefcases, open them, or examine their contents.

The evidence also revealed that petitioner's wife had given the briefcases in question to her friend, Rita, for storage. Rita, who later married James Cusick, asked the latter to store the briefcases. James stored the briefcases in the shed to the rear of his home on Molette, where they remained until discovered by Deputy Vega.

Respondent has spent a considerable amount of time defending the seizure and

---

traditional harmless error tests ('the requirement that prejudice appear does not mean that relief is available only if the defendant would have been acquitted but for counsel's blunders.' Majority Opinion at 1333).'' (586 F.2d at p. 1341, fn. 19)

**12.** As the dissent in *Cooper* points out (at p. 1341, fn. 19), it is not altogether clear from the majority opinion in that case who has the burden of proving or disproving prejudice. In the present case this issue need not be resolved since, as will be explained below, the Magistrate has concluded counsel's ineffective representation clearly resulted in prejudice to the defense.

**13.** Stanley Cusick testified the door to the shed was closed.

search of the briefcases on the ground Deputy Vega's action was justified by the existence of a bona fide emergency. Petitioner, on the other hand, disputes the existence of an emergency and argues that the briefcases were seized without consent. The Magistrate believes it is unnecessary to discuss any of these contentions since the determination of the potentially meritorious nature of the Fourth Amendment claim which counsel's ineffective representation withdrew from the case can be made on a much easier basis.

Assuming, without deciding, that the police officers lawfully entered the Cusick back yard and assuming, without deciding, that Deputy Vega properly entered the shed and seized the briefcases, the fact is once the briefcases were in his possession, Stanley Cusick and his friend were being 'detained, and no one was observed in the shed, a strong argument can be made that there was no constitutional justification for opening the briefcases and examining their contents without a search warrant.[14] This appears to be the law today (*Arkansas v. Sanders*, —— U.S. ——, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979)) and appears to have been the law in both California (*People v. Marshall*, 69 Cal.2d 51, 69 Cal.Rptr. 585, 442 P.2d 665 (1968); see also *People v. Hawkins*, 273 Cal.App.2d 529, 78 Cal.Rptr. 286 (1969); *People v. Mozzetti*, 4 Cal.3d 699, 94 Cal. Rptr. 412, 484 P.2d 84 (1971); and *People v. Landa*, 30 Cal.App.3d 487, 106 Cal.Rptr. 329 (1973)), and this Circuit (*U. S. v. Rothman*, 492 F.2d 1260 (9th Cir. 1973); *People of the State of California v. Hurst*, 325 F.2d 891 (9th Cir. 1963)) at the time petitioner's case was tried. Based on the foregoing discussion it is clear counsel's ineffective representation had the effect of withdrawing a potentially meritorious Fourth Amendment

Claim.[15] It remains to be seen whether there is a reasonable possibility petitioner would not have been convicted had a motion to suppress the briefcases and their contents been made by counsel and granted by the court.

### The Reasonable Possibility of Conviction Issue

In California the conviction of a person charged with a crime cannot be had upon the testimony of an accomplice unless that testimony is corroborated by such other evidence as tends to connect the defendant with the commission of the offense. (Penal Code § 1111; CT 73.) In the present case the court instructed that "If the crimes charged in this case were committed by anyone, the witness RONALD HAYWARD was an accomplice as a matter of law and his testimony is subject to the rule requiring corroboration." (CT 75)

In light of the California law referred to above, it was clear almost from the inception of petitioner's trial that the critical issue in the case was whether the prosecution would be able to produce sufficient evidence to corroborate Hayward's testimony. Indeed, when the subject of the introduction of the contents of the briefcases first came up during petitioner's trial the following colloquy took place between the court and counsel:

"THE COURT: Well, let's get one thing understood here, because I like to proceed on the basis of practicality to the extent that it's possible in fairness to everybody.

"It doesn't appear to me that there is any contest here that the crimes alleged occurred.

"Is that correct, gentlemen?

"MR. DEMBY: That's correct.

---

**14.** No argument can be made that the seizure and search of the briefcases was incident to a lawful arrest since no one was arrested at the Cusick home. Cf. *People v. Baker*, 12 Cal. App.3d 152, 90 Cal.Rptr. 508 (1970).

**15.** The potentially meritorious nature of the Fourth Amendment claim is further demonstrated by the statements made by the trial court when commenting upon other briefcases

seized by law enforcement officers without a warrant. Thus, the court stated: "As far as the Court is concerned, I can see little grounds for arguing that that particular briefcase with whatever is in it would be seizable by an officer as being contraband in plain sight. There is nothing, as far as I can tell in the law, that prohibits the possession of any of those items, per se." (RT 273)

" . . .

"THE COURT: I doubt that anybody's seriously going to contest that this witness participated in them?

"MR. FOGEL [counsel for co-defendant]: Absolutely not, Your Honor.

"THE COURT: The contest is going to be over whether there's any corroboration to tie in the other people that he alleges participated with him.

"MR. POYET [counsel for co-defendant]: That's all.

"THE COURT: Now, does this physical evidence in some way go to that issue?

"MR. WATSON [the prosecutor]: Yes. The prosecution intends to tie it, all the physical evidence I'm talking about, to Mr. Moran. Not Mr. Hayward. We didn't get it from him." (RT 257–258)

It will be recalled that Hayward testified that he and petitioner committed the Lynn and Hargens offenses together. With respect to the Lynn offense Hayward testified that tape was used on Lynn's eyes, that Lynn was handcuffed, and that both he and petitioner had guns. With respect to the Hargens offense, Hayward testified that he and petitioner possessed guns and that handcuffs were used. Significantly, Hayward also testified that some of the items in the briefcases (People's Exhibits 6 and 7) were the same or similar to items used by him and petitioner in committing the Lynn and Hargens offenses. (RT 281–288)

■ Hayward's testimony, standing alone, was insufficient to convict petitioner because of the California law requiring the testimony of an accomplice to be corroborated. In light of this fact there can be little doubt the contents of the briefcases served to corroborate Hayward's testimony. Indeed, the only remaining question is whether the record reveals that sufficient corroborative evidence of Hayward's testimony, independent of the contents of the briefcases, was introduced at petitioner's trial so as to justify the conclusion that the admission of such contents was harmless beyond a reasonable doubt, i. e., there is no reasonable possibility that the admission of the contents of the briefcases contributed to petitioner's convictions.

It must first be observed that neither Lynn nor Hargens, nor anyone else for that matter, was able to identify the perpetrators of either the Lynn or Hargens offenses. Additionally, the statements made by the California Court of Appeal in affirming petitioner's conviction are most revealing with respect to the corroboration issue. The Court stated:

"Here there is evidence which, independently of Hayward's testimony tends to implicate the defendant in the crimes charged against him. His possession of the fur coat taken in the Hargens robbery connects him with that crime and the others committed along with it. The distinctive modus operandi of the Hargens and Lynn crimes indicates that if defendant committed the Hargens offenses he also committed the crimes against Lynn. Both offenses involved the transportation of a blinded victim to another location from which substantial loot was taken. In both series of criminal conduct the criminal used the highly unusual technique of restraint of the victim by handcuffs. The two sets of crimes were closely connected in time. Adding to that corroboration is defendant's possession of the tools of kidnapping in the form of handcuffs and adhesive tapes. (Citation omitted.)." (Slip Op., p. 6)

Several important points must be made with respect to the above quoted statements by the Court of Appeal. Thus, it is true that a fur coat was taken in the Hargens robbery. It is also true that a witness, one Timmons, testified that co-defendant Papageorge asked him (Timmons) to unload a Simca car (which belonged to petitioner) in 1972 and to get rid of the items located in the car. Timmons testified that he did get rid of all of the items except a fur coat, although he did not tell Papageorge he kept the coat. Timmons also testified that he had a conversation with petitioner about the fur coat. In this conversation, after being advised by Timmons that he (Timmons) had gotten rid of the fur coat, petitioner stated, according to Timmons, that

the latter should have kept the fur coat because it was a good one.

It is also true, as the Court of Appeal noted, that Timmons' testimony could have served as corroboration for Hayward's testimony since the former's testimony connected petitioner with an item (the fur coat) taken from the Hargens robbery. The Court of Appeal's statement, however, overlooks the fact that Timmons' testimony was impeached by the testimony of Hargens himself. Thus, Hargens testified that when he talked to Timmons about the fur coat the latter testified that he had obtained the coat from defendant Papageorge; there was no mention that the coat was obtained from the Simca automobile as Timmons testified at trial. Indeed, Hargens further testified that Timmons told him that when he (Timmons) was given the coat by Papageorge, the latter offered Timmons a choice of coats.

The above-quoted statement made by the Court of Appeal on the subject of corroboration is also important because it specifically recognizes the fact that the contents of the briefcases also served to corroborate Hayward's testimony.[16]

A number of other factors appear of record which leave little doubt that the contents of the briefcases played an important part in corroborating Hayward's testimony. Thus, when the subject of the briefcases first came up the prosecutor indicated the evidence was going to be used to corroborate Hayward's testimony. (RT 257–258) Subsequently, in arguing against the grant of the motion for judgment of acquittal made on behalf of petitioner, the prosecutor relied on the contents of the briefcases to defeat the motion. (RT 730)

In addition to the foregoing evidence, it is patently clear that it was the issue of corroboration that so bothered the jury that it was required to deliberate for nine days before reaching verdicts. The record reveals that after the jury had been deliberating for almost six days it sent a note to the court requesting further clarification of the law relating to corroboration (RT 847), whereupon the court made further statements on this subject. (RT 859–862) On the seventh day of deliberation the jury returned to the courtroom and the trial judge, after inquiry, discovered the jury had taken sixty-six total ballots without reaching a verdict as to either petitioner or his remaining co-defendant (Papageorge). During this proceeding the jury foreman, upon further inquiry by the court, indicated it was the issue of corroboration that was causing the jury problems. (RT 878–879)

Finally, whatever doubt may have existed with respect to the role the briefcases and their contents played in corroborating Hayward's testimony was dispelled by the trial judge's comments made during the hearing on petitioner's motion for a new trial. The court stated:

"As to the briefcases, and their contents, it does appear to the Court that the conclusion must be reached that they had some part to play in the defendant Moran's conviction of the Heckle Lynn matter, because as I look back over the case now, there is at best slight corroboration as to the Heckle Lynn incident . . . . .

"So, I am led to the conclusion that logically it would appear that the evidence must be said to have in all probability contributed as to Mr. Moran's conviction of those counts.

---

**16.** The Court of Appeal further stated that Hayward was corroborated by "the distinctive modus operandi of the Hargens and Lynn offenses." The Court reasoned that "if defendant committed the Hargens offenses he also committed the crimes against Lynn." (Slip Op., p. 6) There appears to be merit to the following argument of petitioner: "What all this evidence established was that Hayward committed both crimes. Apart from his testimony, there is no evidence that he committed both with the same accomplice. Since the identification of petitioner was the issue that needed corroboration as to both crimes, the similarity between them, given Hayward as a common factor, adds nothing by way of corroborating evidence. Moreover, it is just as likely that the jury used the briefcase evidence to bootstrap the Hargens counts as that it used the Timmons evidence to bootstrap the Lynn counts. Every piece of corroborating physical evidence was therefore of crucial importance." (Petitioner's Corrected Supplemental Points and Authorities filed April 17, 1979, at p. 14).

"I feel that the element of corroboration in the Heckle Lynn matter, which I believe was count I, II and III—

"MR. DEMBY: I believe it may also have been count IV.

"THE COURT: Yes, the first four counts.

"That the element of corroboration as to those four counts is slight. Even overcoming any objection to the introduction of the briefcase and its contents, the evidence is still slight.

"The Court did its best to instruct the jury on the issue of corroboration as it appears to be mandated by the appellate decision, but I must again say that they are not exactly a well-defined road map. "Some of the course markings seem to lead you into a dead end or a detour, at best.

"And I will say this very frankly, if that were the only conviction before me, it is conceivable that I might feel differently. "What I'm saying is that I hope I am not subconsciously influenced by the fact that Mr. Moran stands convicted of the Donovan Hargens matters and as I will state in just a moment, I see no grounds for a new trial as to the Hargens case.

"Therefore, it seems to me, that from a practical standpoint, no purpose would be served by a reversal as to the Heckle Lynn matters.

"But, despite that, I am trying to set aside and simply rule on the Heckle Lynn as though it were standing alone. Even though, as I say, because of my ruling in the Hargens case, it doesn't appear to me that whether Mr. Moran is convicted or not of the Heckle Lynn matter is going to make much difference.

" . . .

"I consider the issue of—as far as this Court is concerned, there is only one cogent issue as to the granting of a new trial in Count I. And that is whether there is sufficient evidence to corroborate Hayward.

" . . .

"I think that it's a very close question as to whether what's present there is suffi-cient under the law for corroboration. I think it is.

"But, it certainly wouldn't surprise me to take a poll of 100 judges and find 50 who thought it wasn't." (RT 262–264)

In sum, it is quite clear, as the trial judge pointed out, that absent the briefcases and their contents almost no evidence was introduced to corroborate Hayward's testimony with respect to the Lynn offenses. It is clear, therefore, that it must be concluded there is a reasonable possibility that the admission into evidence of such evidence contributed to petitioner's conviction of the Lynn offenses.

Although Timmons' testimony concerning the fur coat provided corroboration with respect to the Hargens offenses that was not present in the Lynn offenses, it is also a fact, as pointed out by petitioner, that Timmons "was himself impeached by victim Hargens on the issue of where and how Timmons got the fur coat. The jury could therefore have disbelieved Timmons completely with respect to the defendant's involvement with the fur coat, but convicted defendant because of Hayward's testimony alone as corroborated by the briefcase evidence." (Corrected Supplemental Points and Authorities filed April 17, 1979, at pp. 1314). In light of these facts the Magistrate is constrained to conclude there is a reasonable possibility that the admission into evidence of the contents of the briefcases contributed to petitioner's convictions of the Hargens offenses. Moreover, since the conspiracy count of which petitioner was convicted (Count X) was based on the evidence introduced in connection with the underlying substantive offenses, it is clear petitioner is entitled to the issuance of a writ of habeas corpus with respect to all of the offenses of which he was convicted.

*Petitioner's Claim of Incompetence of Counsel During Trial*

█ Even had the Magistrate not concluded petitioner's trial counsel failed to render reasonably competent and effective assistance prior to trial, he would have concluded counsel failed to render such assist-

ance during trial. The evidence of record reveals, as indicated above, that the subject of the introduction of the contents of the briefcases first arose when Hayward, the first trial witness, was on the witness stand. After some colloquy occurred a recess was taken. (RT 262) Following this recess petitioner's counsel stated that since the briefcases were not seized from petitioner, "I don't feel I have a motion there." (RT 263)

█ There can be no doubt counsel's statement was based on his ignorance of the California law relating to the standing required to raise an illegal search and seizure claim. Indeed, counsel admitted his ignorance of this law at the evidentiary hearing. While the law is different in many other jurisdictions, including the federal courts (see, e. g., *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)), the law in California at the time of petitioner's trial, and indeed now, is that anyone against whom evidence is sought to be introduced may raise the claim that the evidence was obtained as the result of an illegal search and seizure. *People v. Martin,* 45 Cal.2d 755, 290 P.2d 855 (1955); *Kaplan v. Superior Court,* 6 Cal.3d 150, 98 Cal.Rptr. 649, 491 P.2d 1 (1971). It appears, therefore, that counsel failed to make a motion to suppress the contents of the briefcases when first confronted with them during trial, even though he was aware he could make a motion during trial if he could demonstrate the motion was based on newly discovered evidence, because he was uninformed of California law relating to standing. By failing to make an in-trial motion to suppress under such circumstances, it is clear counsel failed to afford the assistance reasonably expected of an attorney in a criminal case. Since, as was discussed above in connection with petitioner's claim of pre-trial incompetence, counsel's ineffectiveness prejudiced the defense (*Cooper v. Fitzharris, supra*), petitioner is also entitled to relief on his claim of in-trial incompetence.[17]

█ It should be noted that respondent argues that since counsel was under a misapprehension as to the state of the California law relating to the standing required to raise Fourth Amendment claims, no federal constitutional question is presented for review in this court. Respondent's argument is wholly without merit. Thus, it is perfectly clear that counsel's performance in a state court can be deemed ineffective within the meaning of the Sixth Amendment even though counsel's action or inaction resulted in depriving the defendant of a defense recognized only under state law. *Brubaker v. Dickson, supra; Wilson v. Reagan,* 354 F.2d 45 (9th Cir. 1965).[18] It is the denial to the defendant of the effective assistance of counsel, and not whether counsel's lack of diligence resulted in the defense being deprived of a defense recognized only by state law, that is significant for Sixth Amendment purposes.

It should also be noted that respondent contends petitioner was not prejudiced due

---

17. Interestingly, even if counsel were correct in his belief that a possessory interest in the items sought to be suppressed was required in California before a motion to suppress could be made, such interest would appear to have been present in this case since the briefcase in question belonged to petitioner. *Jones v. United States, supra.* For this additional reason counsel's representation must be considered to have been ineffective. Counsel's ineffective assistance also appears from the fact he never requested a continuance after being confronted with the damaging briefcases and their contents and never made a motion to suppress after the briefcases and their contents were admitted into evidence, although the court had earlier invited him to do so. (RT 268)

18. In *Brubaker* the court held that defense counsel's incompetence had the effect of withdrawing from the case the defense of diminished capacity—a defense recognized by state law. Indeed, the court first set forth and discussed the California law on the subject before concluding counsel's inaction deprived the defendant of the opportunity of presenting this defense, cognizable under state law, to the state court. (310 F.2d at p. 38). In *Wilson* the court based its finding that counsel was incompetent in part due to the fact counsel was unaware that under the California law which was in effect at the time the defendant was sentenced, a probationary sentence could be imposed. In fact, counsel agreed with the sentencing judge, in open court, that the court was without legal power to grant probation.

to counsel's failure to advance a Fourth Amendment claim on behalf of petitioner and bases his contention in part on the following reasoning:

"On the other hand, defense counsel also admitted that he was aware of a cassette tape recording damaging to his client that was contained in the briefcases seized at the Cusick residence. Defense counsel was worried that if he made a motion to suppress the evidence and the motion was denied, the prosecutor could then introduce the evidence of the tape, despite his claim that he did not intend to use it as evidence. By failing to make the motion to suppress, it is reasonable that defense counsel decided that evidence of the briefcases containing items such as adhesive tape, handcuffs, tools was less damaging than evidence of the cassette tape . . . Therefore, there appears to be a legitimate tactical reason for defense counsel's failure to make the motion to suppress the evidence of the briefcases." (Respondent's Supplemental Points and Authorities in Support of Return to Petition for Writ of Habeas Corpus by a Person in State Custody, filed March 15, 1979, at pp. 8–9)

Respondent's argument is unpersuasive for several reasons. First, the argument flies in the face of Mr. Demby's evidentiary hearing testimony that his failure to move to suppress the contents of the briefcases was not based on a tactical decision made by him. Second, the record developed at the evidentiary hearing reveals that the prosecutor specifically advised Demby that he (the prosecutor) would not introduce the tape recording and that the tape recording was not in fact introduced, in spite of the fact a number of other items from the briefcases were introduced. Based on this record it cannot be concluded Demby failed to move to suppress the contents of the briefcases based on a tactical decision.

### Claims of Incompetence of Counsel not Related to the Fourth Amendment

Petitioner has presented two additional claims of incompetence of counsel which are unrelated to the Fourth Amendment and which must be addressed by the Magistrate. These claims are:

1. Although urged by the petitioner to do so, trial counsel failed to subpoena petitioner's jail records from the Costa Mesa City Jail and the Orange County Jail in order to determine if petitioner was incarcerated at a time that a crucial meeting took place between petitioner and the chief witness against him.

2. That trial counsel failed to obtain the police reports concerning a complaint by the witness Timmons of a burglary occurring at his premises in 1974, which burglary may have been the basis for the witness' revenge motive in attributing a damaging statement to the petitioner.

Prior to addressing these claims on the merits it must be observed that respondent contends such claims are not properly before this Court since petitioner has failed to exhaust state remedies with respect thereto. Respondent's contention that petitioner has failed to exhaust state remedies is without merit.

Respondent does not contend that petitioner failed to exhaust state remedies because he did not present his claims to the California Supreme Court. Rather, respondent contends that because the Supreme Court of California and the United States Court of Appeals for the Ninth Circuit changed their respective tests for judging the incompetence of counsel subsequent to petitioner's presentation of his claims to the California Supreme Court, petitioner should be required to return to the California Supreme Court and present his claims for review under the new tests. As indicated, there is no merit to respondent's contention.

It is true, as respondent argues, that the California Supreme Court and the Ninth Circuit changed their respective competence of counsel tests after petitioner presented the claims under discussion to the former court. Thus, as has been previously indicated, in *Cooper v. Fitzharris, supra,* the court held that the test to be employed in this Circuit for judging a criminal defense attorney's competence is whether the attor-

ney rendered reasonably competent and effective assistance. Similarly, in *People v. Pope*, 23 Cal.3d 412, 152 Cal.Rptr. 732, 590 P.2d 859 (1979) the California Supreme Court abandoned the "farce and sham" test and held that a criminal defense attorney's performance is to be judged by the standard of whether he afforded reasonably competent representation.

■ It is unnecessary to decide whether the test enunciated in *Cooper* is the same, similar to, or different than the one set forth in *Pope* because, in any event, the *Cooper* test is not binding on the California courts. Thus, it is clear that absent a pronouncement from the United States Supreme Court that a particular test for judging the competence of a defense lawyer in a criminal case must be employed by the state courts, the states are free to develop their own tests. Since the Magistrate is not aware of any such test that has been mandated by the United States Supreme Court, it is clear California was free to adopt the test it did adopt in *Pope*. It is also clear it would be futile to return this case to the California Supreme Court in light of *Cooper* since that court would not be bound by *Cooper* in any event. *People v. Bradley*, 1 Cal.3d 80, 81 Cal.Rptr. 457, 460 P.2d 129 (1969). Nor is petitioner required to return to the California Supreme Court in order for it to be concluded he has exhausted state remedies, even though it is true the court in *Pope* enunciated a new test for evaluating a criminal defense attorney's competence. *Roberts v. LaVallee*, 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967); *Francisco v. Gathright*, 419 U.S. 59, 95 S.Ct. 257, 42 L.Ed.2d 26 (1974).

■ Turning to the merits of petitioner's claim that his counsel was incompetent in that he failed to subpoena petitioner's jail records, it appears, but is by no means certain, that petitioner is contending that if his jail records had been subpoenaed by his counsel they would have shown petitioner was in jail at the time Hayward testified he and petitioner first met (in January or February 1971). Assuming *arguendo* counsel was negligent in not subpoenaing these rec-

ords, it does not appear this negligence prejudiced the defense. Hayward testified that he first met petitioner in January or February 1971. Whether this was true or not does not seem to make much difference in light of the fact there was a substantial amount of other evidence introduced at petitioner's trial which placed petitioner in the company of Haywood on a number of occasions. Although the jail records may have served to impeach Haywood, the impeachment would have been on such a relatively minor point that the Magistrate is unable to state petitioner's defense was "prejudiced" as that term is used in *Cooper v. Fitzharris*, *supra*.

■ Petitioner's final contention is that his trial counsel was incompetent in that he failed to obtain police reports relating to the alleged burglary of Timmons' residence. This contention must be rejected because it is conclusory in nature and unsupported by sufficient facts. *Boehme v. Maxwell*, 423 F.2d 1056 (9th Cir. 1970). Petitioner has failed to present proof to this Court that the police reports to which he refers ever existed, let alone present those reports to this Court. Moreover, assuming *arguendo* the police reports did exist, it is much too speculative to assume, based on the presentation petitioner has made, that his defense was prejudiced because the reports were not obtained by his counsel.

### The Relief to which Petitioner is Entitled

Having decided, for the reasons stated above, that petitioner is entitled to the issuance of a writ of habeas corpus, it remains to be decided how the writ should be framed.

It will be recalled that the Magistrate has concluded counsel's ineffective representation had the effect of prejudicing the defense by withdrawing a crucial defense, i. e., the defense that critical evidence was introduced at petitioner's trial which was obtained in violation of the Fourth Amendment. The Magistrate has not concluded, of course, that petitioner should prevail on his Fourth Amendment claim. Rather, in

the present proceeding it was only necessary to conclude that petitioner's Fourth Amendment claim was potentially meritorious.

If counsel had not rendered ineffective assistance, the result would have been that petitioner's Fourth Amendment claim would have been presented to and ruled upon by the state courts. Accordingly, in order to restore the *status quo,* the Magistrate does not believe it is necessary to order that petitioner receive a new trial. Rather, it is only necessary for this Court to order that a writ of habeas corpus issue discharging petitioner from custody unless the respondent and the State of California shall, within sixty days from the date the Court's judgment becomes final, permit petitioner to file a motion pursuant to California Penal Code § 1538.5 to suppress the briefcases and their contents. If that motion is denied petitioner shall be permitted to appeal to the California Court of Appeal and the California Supreme Court from the denial of the motion. Penal Code § 1538.-5(m); *Lefkowitz v. Newsome,* 420 U.S. 283, 95 S.Ct. 886, 43 L.Ed.2d 196 (1975). If petitioner is unsuccessful in obtaining relief in the state courts, he will nevertheless have been afforded the same opportunity of fully and fairly litigating his Fourth Amendment claim in those courts as he would have had counsel properly raised the claim at all levels of the state courts. When this occurs the requirement of *Stone v. Powell, supra,* will be satisfied and it would then appear this Court would be barred from reviewing such claim under the mandate of *Stone.*

If, on the other hand, petitioner's motion to suppress is granted, then, and only then, should petitioner be entitled to have his conviction set aside and receive a new trial.[19] This result follows since this Court, if it follows the Magistrate's recommendation, will have already concluded petitioner's defense was prejudiced by the introduction into evidence of the briefcases and their contents.

The Magistrate finds that by reason of the foregoing, it appears from the application that petitioner is entitled to a writ of habeas corpus from this Court.

IT IS THEREFORE RECOMMENDED that a writ of habeas corpus issue in the form described above.

Dated: July 24, 1979

### SUPPLEMENTAL REPORT and RECOMMENDATION

HARVEY A. SCHNEIDER, United States Magistrate.

A Report and Recommendation of the undersigned Magistrate and a Proposed Order Conditionally Granting Petition for Writ of Habeas Corpus and a Proposed Judgment were served on the parties herein on July 25, 1979, as provided in General Order No. 194 of this Court.

On August 16 and August 20, 1979, petitioner and respondent, respectively, filed objections to the Magistrate's Report and Recommendation. The Magistrate believes all of the objections of the parties are not well taken and should be overruled. Accordingly, the Magistrate reaffirms his original recommendation to this Court.

The Magistrate wishes, however, to make one additional comment. Thus, in his objections to the Magistrate's Report and Recommendation, petitioner requests that "at the least, . . . the State trial Court, should it grant Petitioner's motion pursuant to Section 1538.5 *California Penal Code,* be ordered to set aside his conviction, order a new trial and admit Defendant to bail before the prosecution exhausts its appeal on the granting of that motion." (Petitioner's Objections, p. 2) The Magistrate believes it is unnecessary for the Court's order to contain the provisions requested by petitioner.

In the first place, as petitioner acknowledges, it is clear from the Magistrate's Re-

---

**19.** It seems unnecessary to state that if the motion to suppress is granted and if the state seeks appellate review of the order granting the motion (California Penal Code § 1538.5(*o*)), petitioner would not be entitled to a new trial until the state unsuccessfully exhausts its appellate remedies.

port and Recommendation that if the Magistrate's recommendation is followed by this Court and if petitioner's Penal Code § 1538.5 motion is subsequently granted in state court, petitioner's conviction will be required to be set aside since this Court will have already concluded petitioner was prejudiced by the introduction into evidence of the briefcases and their contents. What petitioner is apparently concerned about is the possibility that the state court may grant his Penal Code § 1538.5 motion but nevertheless rule the admission of the evidence was harmless error. Simply stated, this Court will not assume that if petitioner's Penal Code § 1538.5 motion is granted the California courts will intentionally defy this Court's finding that petitioner was prejudiced by the introduction into evidence of the briefcases and their contents. Moreover, should such an unlikely event occur, this Court retains the inherent jurisdiction to enforce its judgment. In other words, if petitioner ultimately proceeds on his Penal Code § 1538.5 motion and if he is not then given a new trial, he may make direct application to this Court for enforcement of its judgment.

Finally, the Magistrate believes it would be entirely inappropriate for this Court to issue an order directing the Los Angeles Superior Court, if it grants petitioner's Penal Code § 1538.5 motion, to admit petitioner to bail. Under such circumstances the amount of bail, if any, the Los Angeles Superior Court sets should be a matter for it to determine in the first instance. The Magistrate's comments are in no way intended to affect petitioner's right to apply for bail in this Court in the event respondent appeals from this Court's judgment. Rule 23(c), Federal Rules of Appellate Procedure.

### APPENDIX A

THE COURT: Well, is this something newly discovered?

MR. WATSON: No, Your Honor. We've had it for several months.

THE COURT: Well, 1538.5 requires a motion prior to trial.

MR. WATSON: I understand.

THE COURT: Unless there's good cause as to why it was not raised at that time.

MR. WATSON: And there may be. I don't know.

I don't know of any good cause, but Mr. Demby may know, or one of the other defense counsel.

I just don't want to be surprising somebody when I bring this stuff into the courtroom.

THE COURT: What stuff?

MR. WATSON: License plates, handcuffs, guns, bullets, knives.

THE COURT: Well, let's get one thing understood here, because I like to proceed on the basis of practicality to the extent that it's possible in fairness to everybody.

It doesn't appear to me that there's any contest here that the three crimes alleged occurred.

Is that correct, gentlemen?

MR. DEMBY: That's correct.

MR. FOGEL: Correct.

THE COURT: I doubt that anybody's seriously going to contest that this witness participated in them?

MR. FOGEL: Absolutely not, Your Honor.

THE COURT: The contest is going to be over whether there's any corroboration to tie in the other people that he alleges participated with him.

MR. POYET: That's all.

THE COURT: Now, does this physical evidence in some way go to that issue?

MR. WATSON: Yes. The prosecution intends to tie it, all the physical evidence I'm talking about, to Mr. Moran. Not Mr. Hayward. We didn't get it from him.

THE COURT: How did you plan to do that?

MR. WATSON: In one case an arresting officer is going to say when he arrested him, he arrested him at the trunk of his car, and this shoulder holster was in the trunk,

this .38 automatic which this witness will say is the gun that he's been talking about, was in the glove compartment, I think. I can't remember exactly.

And three briefcases, or two briefcases full of these burglar kits that the witness has been testifying to were discovered by Norwalk deputy sheriffs in the City of Norwalk, in somebody's back yard.

They said to that somebody, "Where did you get these?"

And it went back to a man. They went back to the man. They said, "Where did you get these?"

He said, "I got them from Dixie Moran."

And I intend to call him in here, show him the things and say, "Did you ever see these before?"

He says, "Yeah, Dixie gave them to me."

THE COURT: Well, I'm sure that Mr. Demby is aware of the fact that just because the witness says a certain item that the defendant had on him was used in a burglary or robbery, that doesn't corroborate the fact, just because that item was found on Mr. Moran, that it was, in fact, used in the robbery.

For example, if you have a gun that was found on Mr. Moran when he was arrested, and this witness says that gun was used in the robbery of Mr. Lynn, that is not corroborative evidence at all.

MR. WATSON: I understand that. However, some of these items other than the gun are by their nature burglar tools. And nothing else. And it's possession of burglar tools—

THE COURT: But, they're going to have to be tied to the particular burglaries here, without reference to this witness' testimony.

MR. WATSON: Well, I can't do that. I submit that independent possession of burglar tools does tend to corroborate—

THE COURT: Well, we will have our argument on that at a later time.

MR. WATSON: All right. I've made my statement. That's what I intend to do at the end of the recess.

THE COURT: Right now I am only concerned about this aspect, somebody is telling me there is going to be a motion to suppress, that as far as I can see is tardy.

MR. DEMBY: At this point I am probably confused. And I am not clear as to what Mr. Watson says.

From the material I've gone over, where a lot of this stuff was discovered—

THE COURT: That's the very purpose for a 1538.5 motion.

MR. DEMBY: I was originally under the impression that none of this stuff was found in the possession of Mr. Moran. That items were found, but were found by other people when Mr. Moran was not present. And not—

THE COURT: Was there a discovery motion in this case?

MR. DEMBY: Yes, Your Honor.

THE COURT: Do the documents that were discovered show the origin of the material?

MR. WATSON: Yes.

MR. DEMBY: I may have misread some, but Mr. Watson has just stated some stuff was found in some lot, and I take it that lot has no connection with Mr. Moran.

MR. WATSON: What doesn't?

MR. DEMBY: I take it you state that some items were found in a back yard. Does that back yard have any connection with Mr. Moran?

MR. WATSON: Not directly. I anticipate some people are going to come in and say, "Those items were given to me by his wife. And she told me to hide them."

MR. DEMBY: Okay. My impression is correct then that you did not discover that from Mr. Moran or from his house or car.

MR. WATSON: Some items were taken from Mr. Moran's car at the time of his arrest. That I intend to use. That's correct.

There were also items taken from his house pursuant to a search warrant that I am not, I do not intend to offer. And I don't think they are within the warrant.

MR. POYET: I don't think there was a search warrant, as I recall.

MR. WATSON: It doesn't matter because I don't intend to offer that in the case in chief, anyway.

THE COURT: Wait a minute. We are going to take a recess for the reporter and for the attaches here.

During the recess, will you please show counsel what you intend to offer here so we can straighten this matter out.

MR. FOGEL: Excuse me, Your Honor. Prior to that do we intend to have an in-chambers discussion as to cross-examination of this witness prior to the beginning of cross-examination?

We discussed doing that at some point in time prior to beginning cross-examination.

There are some issues that, of course, are still open to question whether or not they are going to be allowed to be gone into or not. I just want to bring that up at this point.

MR. POYET: I think that was the understanding, that we would do that. As far as I'm concerned, I was expecting to do that. That might make a good deal short of many matters. The indicated ruling of the Court at the proper time that we should do that.

But, when Mr. Hayward is through, I think it would be the time to do that, before we cross-examine him.

MR. WATSON: On that subject, I would like that same conference because I'm going to object to some of the cross-examination that they propose. But, the transcripts that counsel intend to use, I haven't gotten a look at yet. Yesterday in our off day one of the defense attorneys had taken them away for copying purposes when I came down to get them.

MR. POYET: They're here. Court records.

MR. WATSON: But I haven't had the time, Mr. Poyet. I have been busy.

But, the fact is I really don't know what my objection is to them until I have an opportunity to read them, which I haven't done yet.

MR. POYET: They are very limited.

MR. WATSON: Maybe counsel can guide me to the pertinent passages.

MR. POYET: I will help you in any way I can.

MR. WATSON: So, I join in the request that we have some kind of precross-examination determination.

MR. POYET: Won't take long, I don't believe.

THE COURT: Well, we are not at the point yet, anyway.

Recess. Ten minutes.

(Recess.)

THE COURT: Case A 309 048, the People versus Moran, et al.

The record will indicate defendants present with counsel.

The People are represented.

These proceedings are being held in open court in the absence of the jury and alternate jurors.

MR. DEMBY: Yes, Your Honor. I understand there were items taken from three different sources. One of the sources was a back yard of a lot where they found three suitcases. And that they believe they can tie them to Mr. Moran through the testimony of others.

That was not seized from Mr. Moran. I don't feel I have a motion there.

There was another, some items taken from the house of Mrs. Moran. I understand they were taken pursuant to a search warrant calling for dynamite. I had an indication from Mr. Watson that he did not believe that evidence was admissible.

I believe that's correct.

THE COURT: Admissible, or that he wasn't going to offer it?

MR. DEMBY: I believe both.

MR. WATSON: But, I am going to offer it because I want a ruling. The Court may disagree with me. It may be admissible in which case I will use it in my case in chief.

If it is not admissible in my case in chief, it may yet be admissible in my case in rebuttal.

But, lest I be accused of sandbagging with it, I want to make sure it's not admissible in my case in chief. So, I am going to offer it, yes. Assuming a motion is made to suppress it. And assuming Your Honor entertains the motion.

MR. DEMBY: The third group of items were seized from a car that Mr. Moran was unloading at the time of his arrest. At one time Mr. Poyet noticed a 1538.5. At that time he was going to submit it on the transcript.

The transcript showed that the items that were introduced in evidence were not items seized from any of the defendants. They were items, I believe, turned in to the police by Mr. Timmons.

At that time Mr. Watson indicated that there had been no items seized.

There was a wealth of material given to the defense pursuant to the discovery. I have gone over those items several times. Some items evidently did not register on me of where certain items were attained. I just didn't focus on it.

And I informed Mr. Watson yesterday, I asked him if he planned introducing certain items.

And that's when the discussion came about about a 1538.5.

I don't know if the Court's going to rule that these motions are tardy or not.

THE COURT: Well, there are several things that concern me here, Mr. Demby.

First of all, one of the purposes of a master calendar setup such as has been instituted in the Los Angeles Superior Court is to make sure that courts such as this one devote all or substantially all of their time to trials and not to matters which can be handled pretrial.

MR. DEMBY: Your Honor, the policy that's been undertaken out of Department 124 is that pretrial motions are handled there or some are sent out if they are long ones.

In this case the 995 and related motions were sent out to, I believe, Judge Broady. And he did rule on those motions.

However, 1538.5 motions, for the most part, have been noticed and run at the time of trial. And my understanding, they have been sent out to the trial court with the trial case. They have not been heard by Judge Callister in Department 124.

THE COURT: Well, they don't have to be heard by Judge Callister. But, they are to be heard by some judge exclusive of the trial so that juries don't have to be kept waiting like this one is being kept waiting.

Plus the fact that I notice that there was a 1538.5 run and denied here on October 10, 1974.

Thirdly, the purpose of the legislature in enacting 1538.5 was to have it run before trial so that the People would have the opportunity to appeal an adverse ruling.

MR. DEMBY: I believe the practice of the court is that most 1538.5s are not run until the date of trial.

I might go back to the indication on the motion that was, there's an indication there was denied on October 10—that was a motion entered into, I believe, only by Mr. Poyet. I don't know that it was denied. I thought it ended up—

MR. POYET: I think it was submitted to be determined at the time of trial.

MR. DEMBY: I thought it was withdrawn because there was an indication that nothing had been seized from the defendants.

MR. WATSON: I just want to interrupt. I never said nothing was seized from the defendants. I said nothing offered into evidence at the preliminary hearing had been taken from the defendants. There were four items. None of those things were taken from the defendants.

I didn't ever say nothing was taken from the defendants.

MR. DEMBY: I didn't indicate you said nothing. I indicated the misapprehension I was under.

MR. POYET: This is something new, isn't it, Counsel?

MR. WATSON: On the contrary. It's all contained in the reports that you discovered. And in addition to that, approximately five weeks ago I invited all counsel, including Mr. Poyet, Mr. Demby, to come up to my office and look at the physical stuff. Told them I had a whole bunch of stuff up there and they ought to come up and look at it.

MR. POYET: I never knew that it was what you had here.

MR. WATSON: You never came up to my office.

MR. POYET: I came up three or four times.

MR. WATSON: In addition, all of these items and the circumstances under which they were obtained, are all contained in those police reports that I've provided to you pursuant to the discovery motion.

MR. POYET: Yes. But, I was not aware that these were the items that you've here on the table, except the fur coat. I knew about that.

THE COURT: Well, the 1538.5 on October 10th was as to the defendant Papageorge only. But, apparently all counsel and defendants were present. Appears to me that you are now splitting a cause of action that should have all been heard at once.

MR. DEMBY: Your Honor, I don't believe any of it actually was heard.

THE COURT: It says "Submitted on the preliminary hearing transcript. The Court states it has read and considered the transcript. Motion denied."

MR. FOGEL: The 995 motion was denied. And that was heard on the same date that the 1538.5 motion had been noticed to have been heard.

THE COURT: Well, it's in the clerk's minutes, Mr. Fogel, that both the—there's a separate entry for the 995.

MR. FOGEL: As my recollection serves me, there was no actual determination on the 1538.5. I did not think it had actually been denied.

It occurs to me there was some discussion as to whether or not there actually was a 1538.5 that was pertinent to Mr. Papageorge.

THE COURT: Well, that's really not the essential point. Leaving that aside, I don't see good cause why this motion was not made prior to trial.

MR. FOGEL: I can't enter into that. I'm not making the motion. I was just offering my recollection of that day's proceedings, Your Honor.

MR. POYET: Well, I may say this, that Mr. Watson, I think, I went up a number of times myself to obtain a complete discovery on everything. And he was most cooperative.

He told me he had additional things which he would give me, which he did give me, in the way of documentation.

But, as to anything of what he has here, and proposes to offer now, that is something that I never knew until today.

THE COURT: Well, as far as this Court is concerned, if there is a motion that someone is seeking to make under 1538.5 now, I have heard no legal or good cause why such a motion should now interprose itself in the progress of this trial. And if such a motion is, in fact, being made, it is denied.

However, I will deny it without prejudice to the possible renewal of such a motion at such time as the People seek to introduce the items into evidence.

Right now they are being marked for identification so that the witness can testify to them and so forth.

It appears to me that in the interests of justice, at the time the People seek to introduce these into evidence, that should a motion be made, I will consider it at that time.

MR. POYET: Thank you.

MR. DEMBY: Your Honor, does this also go to the items seized from Mr. Moran's house?

MR. POYET: Any of it.

THE COURT: It goes to anything of which the defense had notice prior to this matter being called for trial.

MR. DEMBY: What I am getting at is Mr. Watson had indicated it was his belief that certain evidence was not admissible.

Is he now allowed to have that evidence introduced and identified and then at some later time have a determination that it should not be admissible?

THE COURT: Well, Mr. Watson is an officer of the court. And if he feels he has some evidence that is not legally admissible, it should not be offered.

## APPENDIX B

MR. WATSON: May this brown one be marked People's 6 for identification, Your Honor?

THE COURT: Yes.

MR. WATSON: There are numerous items in it, Your Honor. Does Your Honor want me to mark them individually, or may they collectively be six?

MR. POYET: I can't hardly hear.

THE COURT: Well, the brown attache case and contents.

MR. WATSON: Thank you, Your Honor. May the black one and its contents be marked People's 7?

THE COURT: Yes.

MR. WATSON: Mr. Hayward, first I want you to look at the contents of six and tell me if you have ever seen any of these items before.

First of all I am holding up a pair of Alcyon handcuffs, "made in Spain" on them, covered with fingerprint powder.

Have you ever seen these items before, sir?

A Yes, I have.

Q And where?

A With Mr. Moran, in his car.

Q Now, I am holding up what appears to be the arm to a windshield wiper. Have you ever seen that before?

A Yes.

Q And is it part of the kit that's in the suitcase?

A Yes.

Q Or briefcase?

A Yes.

Q What's the purpose of this tool?

MR. POYET: May counsel approach the bench, please, Your Honor?

THE COURT: Very well. Reporter, please.

(The following proceedings were had at the bench out of the hearing of the jury:)

MR. POYET: Of course, this is Mr. Moran's attorney, really, but it covers everybody else.

Now, this material—

THE COURT: Keep your voice down, Counsel.

MR. POYET: The material that was furnished us had at no where, at no time did they ever acknowledge that they were going to use anything like this in connection with this case.

And he told me that what he had there was all that he was going to use.

Now, he brings up at this stage, and we'd made a motion to suppress all of this evidence except that which he gave us knowledge of. And which we certainly would be responsible to let him go into.

I would object to all of this evidence going in at this time and move to strike it all on the grounds that it was not disclosed at the time of the service of the motion, 1538.5, to suppress.

MR. WATSON: May I be heard, your Honor?

THE COURT: Yes.

MR. WATSON: It is not true that I ever told anyone I was not using the items that we have just marked. I have never said that to anyone.

On the contrary, I invited Mr. Poyet, Mr. Fogel, Mr. Demby to come up to my office to see the physical things that I had there about four weeks ago.

The mention of these items, the way they were seized, et cetera, is all contained in the police reports provided to them at least six weeks ago pursuant to a discovery motion.

The only remark I ever made to anyone about not intending to use stuff was a remark made to Mr. Demby about the items taken in the search warrant. And I'm not, in fact, using those items. Those items are now up in my office.

THE COURT: Well, it's beyond me at this point to see where you are concerned about these items, Mr. Poyet. They don't seem to bear on your client.

MR. POYET: Yes.

MR. FOGEL: Your Honor, they bear only in that we are discussing conspiracy charges.

MR. POYET: That's the only point, Judge. But, I don't think that's too material, either.

THE COURT: Well, right now they are marked for identification. And any objection that is going to be lodged, I am not going to interrupt this trial now to go into it. If there appears to be merit to it, we will take it up when the question of what is going to be received in evidence comes up.

## APPENDIX C

[Mr. Demby] . . . In this case, there was evidence presented, such as some briefcases that were found at a third party's home, found at the home of Mr. and Mr. Cusick. This material was introduced at the trial and was used to connect Mr. Moran to the crimes.

And I believe this material should not have been allowed into evidence for several reasons.

One, the time it was found and the late date of the finding of the stuff in there did not actually connect Mr. Moran to the crime.

I think its only purpose was to confuse or prejudice the jury to show them that he might be a burglar, that he had a burglar's kit. But, there's nothing in that kit that definitely has been said by anybody but Mr. Hayward that it's Mr. Moran's and he used them in these particular robberies.

He may have, the only thing that can be pointed out by those, by that evidence, is

that if the testimony is believed, is that Mrs. Moran gave it to the Cusicks and the implication is that she got it from Mr. Moran, and it would connect him to some burglaries.

But, I think it cannot connect him to these particular robberies or burglaries. And I think by allowing that in it prejudices Mr. Moran's case.

It's also evidence that was used by the jury to connect Mr. Moran to the burglaries, to corroborate Mr. Hayward's testimony. And I don't think that should have been allowed.

I think there was inadequate corroboration of Mr. Hayward's testimony. I know that the Court denied the 1118.1 motion. You said that there was evidence that could connect Mr. Moran to the crimes. And it did corroborate Mr. Hayward's testimony.

However, I think when you look at that evidence, it is not adequate. The evidence that was used was several.

There was testimony by Mr. Hayward that the handcuffs were used in all the burglaries, and there was testimony by the victims of these burglaries and robberies that handcuffs were used.

There was testimony by Mr. Borek that Mr. Papageorge had bought some handcuffs from him.

And there was the handcuffs found in the briefcases introduced into evidence purportedly being Mr. Moran's.

And this was used to tie Mr. Moran in to the Heckle Lynn robberies and the Hargens robberies.

Also, Mr. Hayward testified that tape was used on Mr. Lynn. And I think Mr. Lynn said that he had been taped.

There was tape found in one of the briefcases. Some one or two years later. And this was testified to by Mr. Hayward, the same tape used by Mr. Moran in the Heckle Lynn robberies. Said to corroborate the testimony of Mr. Hayward.

I think that when you have a common item like tape, it's found several years later, it's prejudicial to allow that into evidence.

To allow it to be used to corroborate the testimony of the witness.

It is not like the tape had been matched, scientifically matched to show that it's the same tape or the same batch of tape from the same manufacturer. They compared tape found on Mr. Lynn and tape found in the briefcases.

I think the only other testimony given, corroborated, was there was a mink coat found in one of two places, according to the testimony. It's either found in a car, supposedly owned by Mr. Moran, by Mr. Timmons, and presented to the police department, or it's given to Mr. Timmons by Mr. Papageorge.

And this was used to corroborate the testimony to show that Mr. Moran committed the Don Hargens robberies.

I believe that in all these situations the wrong standards were used by the jury in trying to come to a conclusion.

I know when Section 1111 is read it's very confusing, especially annotations and the cases to that section. There's some cases that say "any evidence that tends to connect," and then some say "has to be proven beyond a reasonable doubt."

I think the only way that the different cases can be reconciled and the standard that has to be used is, the jury has to be told first they have to find whether there's any evidence at all that can connect Mr. Moran to the case. And to find that there's any evidence at all that can connect they have to find that the statements about that evidence, or the physical evidence connecting Mr. Hayward or Mr. Moran are proven beyond a reasonable doubt.

In other words, they have to prove the connecting fact beyond a reasonable doubt.

Then you get to the second step, whether that proves the case beyond a reasonable doubt. And that's where I think the mistake is made. I think that cases say that all you have to do is show that it tends to connect. Any evidence will do that once that evidence is proven beyond a reasonable doubt.

But, that evidence then does not have to prove the case beyond a reasonable doubt when you disregard the testimony of the accomplice.

And I think in this case the jury felt that if there's any evidence, not necessarily proven beyond a reasonable doubt, that tends to connect, they would have come back with the verdict, with the conclusion that Mr. Hayward's testimony had been corroborated, and, therefore, if they believe his testimony, they have to come back with a verdict of guilty.

I also believe that when the jury came back with their questions and asked for amplifications of the instructions which the Court gave on what "tends to connect" means, the Court's giving that added instructions and the added lecture to the jury was harmful and prejudicial to the defendant's case.

Also, there was evidence introduced into the case besides the briefcases, I believe a gun was also introduced.

The defense, when the case started, wished to run 1538.5 on that evidence to show that the evidence was illegally seized.

The Court ruled that the notice of motion and the running of the motion would be untimely, so denied the right to run the motions.

I think that that was error on the part of the Court in that the motion should have been run and should have been granted.

And by allowing the evidence in, the briefcases found at the Cusicks' yard and the gun found, supposedly, in Mr. Moran's car, were prejudicial. And helped lead to his convictions.

And for those reasons, the motion for new trial should be granted.

THE COURT: Does that conclude your opening argument?

MR. DEMBY: Yes, Your Honor.

THE COURT: Mr. Watson, do you wish to be heard?

MR. WATSON: Yes, I do, Your Honor. A portion of what I wish to say is more in the nature of evidence than argument.

And I don't know how, on the discovery motion and what went on behind the scenes and off the record.

I don't know how Your Honor wants me to get to that. I can just tell you what I know about it or I can take the stand, or whatever Your Honor thinks is more appropriate.

THE COURT: Well, are you going to tell me anything that wasn't put on the record during the course of this trial?

MR. WATSON: I'm not sure.

Yes, I am going to tell you at least some things that you have not been told before.

THE COURT: Proceed.

MR. WATSON: In what manner? Just to tell you?

THE COURT: Yes.

MR. WATSON: Well, Your Honor, I've been trying to reconstruct what happened as far as the discovery goes. And I assume that Mr. Fogel and Mr. Demby are correct when they say they did not get the police reports that mentioned the seizure of the briefcase and their contents at the Cusicks' house. I'm assuming that to be true.

After the discovery motion was granted, I—Mr. Poyet's discovery motion, and I think Mr. Fogel's—I wrote a letter to Mr. Demby and I sent copies to Mr. Poyet and Mr. Fogel.

I have a copy of a letter here that I would like marked as an exhibit.

May I hand it to Your Honor?

THE COURT: Yes.

MR. WATSON: As People's 1.

THE COURT: All right. This will be Court's Exhibit 1. It is addressed to Mr. Demby.

Mr. Demby, did you receive it?

MR. DEMBY: Yes, Your Honor.

THE COURT: All right. Go ahead.

MR. WATSON: After I sent that letter to the three gentlemen I heard from Mr. Poyet who said he would like to come in and pick up the documents in question and take them back to his office.

I said I didn't want him to do that, I'd like for him to look at them there. And he did come over and we got into a discussion.

And it became pretty clear that we were going to be talking about these reports indefinitely unless I let him take them back to his office to copy them. So, I said fine.

But, I asked him if he would wait while I made a list of everything to make sure that when he returned the package I got everything. So, I did do that.

And I have that list here. It's two pages of yellow paper in which there are listed 48 different reports by title and by date.

May I hand that to Your Honor?

THE COURT: Yes.

MR. WATSON: And Mr. Poyet came and picked all of those items up. And among those, I'm not sure which ones right now, but among those were the reports in question that described the incident at the Cusick house and the seizure of all the property.

And I know that to be true because the title and the date of those reports is not duplicated by any other reports. And those titles and dates are on that list.

So, I did give those to Mr. Poyet. He took them to his office.

When he returned the materials, I went through them one by one and checked the numbers by each item to make sure they were all returned. And they were, in fact, all returned.

So, Mr. Poyet took those reports to his office, at least.

In the meantime, Mr. Fogel came and said, "In response to your letter, I'd like to take a look at the items."

Well, I didn't have them. Mr. Poyet had them.

So, I asked him if he would wait.

He said yes.

He waited a couple of days.

Mr. Poyet returned the reports. And I began to work on the case again in preparing the prosecution of the case. And I

disassembled that package. They were my only copies.

I disassembled that package and began to do whatever I was doing to prepare the case.

Several weeks later—no, some time later, I'm not sure how long it was—Mr. Fogel came and then I gave him the package of reports. But, I think what probably happened is I didn't give him the Cusick reports because I had taken them out and was working on them or something. If I didn't give them to him, it was inadvertent. I meant to. But, I probably didn't.

So, Mr. Fogel took the package to his office and copied what he wanted. And then returned it to me. And I didn't make a list or check off receipts when I gave them to Mr. Fogel.

Then I think that Mr. Fogel gave his copied police reports to Mr. Demby to look at. I think. I'm not sure about that. Rather than having Mr. Demby get them from me.

MR. DEMBY: I can probably clarify that. I ran into Mr. Fogel one day and told him I was going to see Mr. Watson.

He told me that he had been there, that Mr. Poyet had the material and it wasn't available.

He then said after it was available he was going to get it.

I then saw him some time later and received copies of everything he received.

MR. WATSON: Okay.

MR. DEMBY: From Mr. Watson. I received them from Mr. Fogel.

MR. WATSON: That's how it happened then. I apparently took the Cusick reports out after Mr. Poyet brought them back in order to continue my preparations of the case.

Now, then the next thing that happened is at some time I made an oral invitation to Mr. Demby and Mr. Fogel and Mr. Poyet at one of our court appearances to come up to my office and view the things that I had up there. I said, somebody asked me what did I have.

And it was four briefcases full of various items.

I said, "I have a whole bunch of stuff. I can't bring it down, there's too much to bring down. But, you better come up and take a look at it."

And I said to Mr. Fogel, "I don't think you're too concerned about it. It doesn't relate to your client."

Mr. Poyet did come up. I'm not positive. But, Mr. Demby did not come up. Mr. Demby did not come up to look at the police reports that I had, nor did he come up to look at the physical items.

I believe, although it's speculative, I believe that had he come to my office instead of relying on Mr. Fogel's set of documents, he would have seen the Cusick reports on my desk. Anyway, it didn't happen that way.

In spite of the oral invitation and in spite of the letter to come up, he didn't come up.

I believe I complied with the discovery order. I made these things available, although Mr. Demby opted for an indirect route to get them, and he assumed incorrectly that he had everything.

I think it's also an inaccurate assumption on Mr. Demby's part that the prosecution will not offer any physical evidence that wasn't either offered at the preliminary hearing or mentioned in a police report.

He apparently is assuming that, and I just don't think that's true. Frequently, investigations continue and new things turn up that are not in police reports or prosecutors elect not to put everything in at the preliminary hearing, or policemen don't make reports covering every interview or every piece of physical evidence.

So, I don't think it's proper for Mr. Demby to assume that he got all the reports, or that the prosecution would not call any witnesses or offer any evidence that he had not seen in the preliminary hearing transcript or the reports that he's got.

He elected to make that assumption, but I don't think it's a correct assumption. And because it is incorrect, I don't think that the

prosecution should be accused of not having complied with the discovery order.

So, I believe it was complied with. If it was not complied with, I think that the failure has been waived because of the following fact:

Your Honor ruled the 1538.5 motion to be untimely, did not allow him to make it.

But, you did say to Mr. Demby that if he wanted to renew the motion at the close of the People's case, that you would hear him then on it. And maybe you would change your mind and allow him a motion to suppress.

But, he had that option open to him.

Well, Mr. Demby did not renew the 1538.5 at any time until apparently now, if that's what that argument went to.

So, if the discovery order was not complied with, the failure was waived by Mr. Demby electing not to renew the 1538.5 motion at the close of the People's case.

That's on the discovery motion.

Much of what Mr. Demby has just said now about the evidence went to the weight and not admissibility. And I don't think that the weight of the evidence is a grounds for a motion for new trial to be granted.

As far as the lack of corroboration to Mr. Moran's involvement, I disagree. I think the handcuffs that were offered into evidence, the contents of the briefcases, the mink coat conversation that Mr. Timmons related that he had with Mr. Moran. Mr. Moran said something like, "Did you look in that briefcase?"

"No, I didn't."

"You should have, there was a valuable mink in it," that also corroborates Mr. Moran's involvement.